UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  2:15-CR-00214-1 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| AUSTIN CARLIN, | ) | Monday, September 26, 2016 |
| | ) | |
| Defendant. | ) | (10:22 a.m. to 11:08 a.m.) |


SENTENCING

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE



APPEARANCES:            See page 2

Court Recorder:         Genay Rogan

Clerk:                  Brandy Cortez

Court Security Officer: Adolph Castillo

Deputy U.S. Marshals:   S. Osteicher; G. Butcher

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988

THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC
EXPENSE UNDER THE CRIMINAL JUSTICE ACT AND MAY
BE USED ONLY AS AUTHORIZED BY COURT ORDER.
UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN
ORIGINAL AND ONE COPY AT THE OFFICIAL RATE.
General Order 94-15, United States District Court,
Southern District of Texas.

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES</u>:


For Plaintiff:            HUGO MARTINEZ, ESQ.
                          Assistant United States Attorney
                          800 N. Shoreline, Suite 500
                          Corpus Christi, Texas 78401

For Defendant:            STEPHEN W. BYRNE, ESQ.
                          Assistant Federal Public Defender
                          606 N. Carancahua, Suite 401
                          Corpus Christi, Texas 78401

1    <u>**Corpus Christi, Texas, Monday, September 26, 2016; 10:22 a.m.**</u>

2                          **(Call to Order)**

3              **THE COURT:**  Court calls Cause No. 2:15-cr-00214,

4    United States of America versus Austin Carlin.

5              **MR. MARTINEZ:**  Hugo Martinez for the United States.

6    Good morning, Your Honor.

7              **THE COURT:**  Good morning.

8              **MR. BYRNE:**  Stephen Byrne for Mr. Carlin.

9              **THE COURT:**  Good morning, sir.  Would you raise your

10   right hand?

11       **(Defendant Sworn)**

12             **THE COURT:**  Okay.  Mr. Byrne, did you substitute in

13   or --

14             **MR. BYRNE:**  I was appointed. The Federal Public

15   Defender had a conflict of interest.

16             **THE COURT:**  Okay.  I guess I missed that.  So you --

17   you have -- Ms. Langford's no longer on the case?

18             **MR. BYRNE:**  That's true.

19             **THE COURT:**  Correct.  Public Defender, the whole

20   office is no longer on the case, so you've been appointed to

21   represent Mr. Carlin.  Mr. Carlin, have you had sufficient

22   opportunity to visit with your attorney here regarding --

23             **THE DEFENDANT:**  Yes.

24             **THE COURT:**  -- the sentencing?

25             **THE DEFENDANT:**  Yes, ma'am, I have.

1          THE COURT:  Okay.  And you've been sworn in.  Would

2    you state your name?

3          THE DEFENDANT:  Austin Carlin.

4          THE COURT:  We're here today for sentencing.  On

5    June 9the, 2016, you entered a plea of guilty to count one of

6    the indictment.  I ordered a presentence investigation report

7    to be done.  Did you receive a copy of the presentence report?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  And did you have a chance to review the

10   report with your attorney?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Okay.  Were you able to read it also?

13         THE DEFENDANT:  I wasn't able to read it so he --

14         THE COURT:  Okay.

15         THE DEFENDANT:  -- he read it for me.

16         THE COURT:  Your attorney read it to you?

17         THE DEFENDANT:  Yes.

18         THE COURT:  You all discussed it together?

19         THE DEFENDANT:  Yeah.

20         THE COURT:  And you're ready to proceed to your

21   sentencing?

22         THE DEFENDANT:  Yes, Your Honor.

23         THE COURT:  Okay.  I don't see any objections on

24   file.  Counsel, any corrections to the report from the

25   Government?

1          **MR. MARTINEZ:**  None from the Government, Your Honor.

2          **THE COURT:**  From the defense?

3          **MR. BYRNE:**  No, Your Honor.  I did file a sentencing

4    memorandum.

5          **THE COURT:**  I received that and I've reviewed that.

6    Okay.  Then the Court will accept the presentence report as its

7    findings of fact and that gives me an advisory guideline range

8    calculated to be a total offense level of 37, criminal history

9    category of III, which produces a range of 262 to 327 months.

10   Is that right, Mr. Martinez?

11         **MR. MARTINEZ:**  That is correct, Your Honor.

12         **THE COURT:**  And Mr. Byrne?

13         **MR. BYRNE:**  Yes, Your Honor.

14         **THE COURT:**  What's the recommendation of the

15   Government?

16         **MR. MARTINEZ:**  Your Honor, prior to making any

17   recommendations, the Government respectfully requests from the

18   Court to call the victim's mother to give a victim impact

19   statement.

20         **THE COURT:**  Okay.  You can proceed.

21         **MR. MARTINEZ:**  Thank you, Your Honor.

22     **(Pause)**

23         **THE COURT:**  Good morning, ma'am.

24         **MS. MULLIS:**  Good morning, Judge.

25         **THE COURT:**  Shall we swear her in or she just reads a

1    statement?

2         **MR. MARTINEZ:**  She just reads a statement, Your

3    Honor.

4         **THE COURT:**  Yeah, okay.

5         **MR. MARTINEZ:**  Would you please state your name?

6         **MS. MULLIS:**  My name is Heather Mullis.

7         **MR. MARTINEZ:**  And are you the mother of Jane Doe,

8    the victim in this case?

9         **MS. MULLIS:**  Yes, I am.

10        **MR. MARTINEZ:**  Do you have a statement you'd like to

11   read for the Court?

12        **MS. MULLIS:**  I do.

13        **MR. MARTINEZ:**  Would you please do so?

14        **MS. MULLIS:**  I have written, re-written the statement

15   so many times trying to find the words that could somehow

16   express how I feel, how this crime has literally torn our lives

17   apart.  I'm here to explain how this unimaginable crime has

18   affected not only Chloe but myself and my entire family.

19        On February 22nd, 2015, around 4:00 a.m., our lives

20   were forever changed and will never be the same again.  From a

21   single phone call, I learned that Austin Carlin not only stole

22   a vehicle from where my daughter was having a sleepover at her

23   grandmother's house with her cousin but she had -- but he had

24   also kidnapped my precious baby girl while she was asleep.

25   It's hard to explain the psychological damage and the emotions

1   and mental anguish that begin from that moment.  It's every

2   parent's worst fear and you realize you have no control of the

3   outcome.

4           I, myself, and my husband got into separate vehicles

5   and began to search for our daughter.  The flashbacks of

6   driving on those dark roads searching in the fog down every

7   road you could think of, making yourself look under brush and

8   even dumpsters thinking you would just find her lifeless body.

9   As a mother, you protect your children at all costs, even if it

10  means your own life, how would I give anything to trade places

11  with her.  Thoughts flood your mind along with questioning

12  yourself, how did this happen.  It was like an out-of-body

13  experience you hear about.  It felt as if I was in one spot

14  while everyone else was moving around me so fast.

15          After hours of searching, I returned home without my

16  child.  To see the faces of my other three children when I came

17  home without Chloe was devastating.  They tried to be strong

18  for me and my husband and protect us from seeing how scared and

19  confused they really were and there was no way to explain where

20  their little sister was and why this happened.

21          Normal is no longer a word to describe Chloe or my

22  family.  Her life and ours have been shattered into a million

23  pieces and they will never be placed back together again as

24  they once were.

25          After Chloe was found, she was taken to local

1  hospital to be examined without me by her side.  She was alone

2  and scared, still not fully understanding what had happened to

3  her.  She has overcome so much at such a young age but has much

4  to still overcome.  Regular trips to the doctor's office is a

5  problem.  Her security and trust have been violated.  She's

6  unable to sleep at night in her own bed because she's afraid of

7  how hard she sleeps, unable to feel or hear anything around her

8  as she states to me.  She relives that morning in her

9  nightmares and she harbors inside herself what she went through

10 and has decided not to speak of anything that happened.  If it

11 is brought up, you see the glimmer in her eyes dull.  She shuts

12 down with a blank stare and her eyes swell with tears of

13 sadness, acting like she can't hear you.  That horrible day

14 never goes away.  Your mind never lets you forget the details.

15 I wonder what goes through her mind and try to reassure my

16 daughter that everything that happened was not her fault.

17         It is a day-by-day struggle after the media coverage

18 of her abduction using her name with the Amber alert system.

19 And then after the report of the sexual assault, they no longer

20 named her but the community still knew her name and her face.

21 It took her and her siblings from being normal everyday kids

22 who went back and forth to school and extracurricular

23 activities to enduring stares, whispers, and questions every

24 time they turned around.  Not knowing the answers people search

25 for or even wanting to be asked, causing issues between them

and other students, leaving them distraught and unable to focus on their schoolwork. They were reminded daily with each new question of the terror that their sister was put through. This crime interrupted the normalcy from Chloe's and her siblings' life (phonetic). Also, a piece of their childhood was taken along with that time that will never be replaced.

Being 15, 14, and 9 at the time, they all now felt an obligation to be with Chloe 24/7. To watch over her, they took turns and never complained but time was taken from them if they wanted to go to their friends' house but didn't or they gave up trips to go places because she was not allowed to go.

As for our family life, the guilt my husband and I carry will never go away as we try to go forward and live life with our children. The crime committed against our child has caused severe setbacks mentally and financially. Chloe is now eight and since that horrific day, has not and will not be allowed to go to stay at her grandmother's house and I am known now as the "no mommy." She always says I tell her no when she wants to go because I'm scared of what may happen after. She doesn't understand the world and the sick people like Austin Carlin who live in it, predators who lurk around with nothing but devilish intentions towards young children waiting to take advantage of their innocence.

Austin Carlin is a lying, deceitful human being, a wolf in sheep's clothing who has manipulated the justice system

1  with lies and deception of his character and making the healing

2  process almost incapable.  He understood how to convey a plan a

3  day before his crime and proceed without any hesitation.  As if

4  that was not enough to kidnap my daughter, he made the decision

5  to sexually assault her and to physically make her

6  inappropriately touch him to gratify himself.  This behavior is

7  malicious and disgusting.

8          We are now aware of Mr. Carlin's history of habitual

9  situations and my daughter is not his first victim but she can

10  be his last.  I'm begging the Court and yourself, Honorable

11  Judge, to see Mr. Carlin for who he truly is and the

12  everlasting damage he has caused.  If not for the quick

13  response of the law enforcement, the community, the volunteers,

14  the AMBER Alert System who never stopped looking for signs of

15  our daughter, I know in the depths of my heart Chloe would no

16  longer be with us today.  When he took her, he had no intention

17  of bringing her home.

18          Judge, I would like to ask that the sentence for my

19  daughter's abductor and abuser be equivalent to the suffering

20  he inflicted.  He did so without the slightest bit of regret or

21  conscious remorse for what he did, and I beg the Court not to

22  give him the opportunity to have another victim.  Austin Carlin

23  deserves nothing less than 50 years for the crime he committed.

24  Why would he deserve to have a life after only 20 years so he

25  can victimize someone else?  There's no rehabilitation for the

1  perverted minds or the crimes against children.

2          **THE COURT:**  Thank you, ma'am.  You can step down.

3          **MR. MARTINEZ:**  May I proceed, Your Honor?

4          **THE COURT:**  Yes.

5          **MR. MARTINEZ:**  Your Honor, the United States is going

6  to recommend the high end on this case and we recognize that

7  that is a very severe offense for someone who's 21 years old,

8  but I think the Court is well aware that this is a very severe

9  crime that Mr. Carlin's committed.

10         And if allowed to do so, I'd like to point out some

11  issues with Mr. Carlin's background that led the Government to

12  this recommendation.  And I'd like to start off by discussing

13  his criminal history which is pretty remarkable because in less

14  than a year, from February the 25th of 2013 to February 5th of

15  2014, Mr. Carlin managed to pick up five criminal convictions.

16  And I will recognize that they're not violent offices.  They're

17  of a theft in nature offense but in all but one of those

18  convictions, Mr. Carlin was given probation.  I think the

19  reason why he was given probation is because he's a youth and

20  because of the severity of the crimes he committed, he was

21  given a break time after time after time; yet after each break,

22  he revoked his bond.

23         In less than a year after his last conviction, he is

24  kidnapping this child and sexually assaulting her.  I think

25  this, even at a very young age, his criminal past says a lot

1    about how dangerous Mr. Carlin is to our community, Your Honor.

2          Now I'd also like to point out that Mr. Carlin does

3    have a history of being a predator.  Specifically, I'd point

4    out to Paragraph 42 where Mr. Carlin, at a very young age,

5    sodomized a four-year-old child.  That was the beginning of his

6    sexual deviancy, Your Honor, which started many years ago but

7    hasn't been able to go away.  And we know it hasn't gone away

8    because Mr. Carlin has been evaluated by numerous doctors, the

9    last of which was a doctor at the Bureau of Prisons.  And I

10   want to refer to his forensic evaluation that has been admitted

11   into evidence at previous hearings where Mr. Carlin admits to

12   thinking about touching females in the ages of ranges of 10 to

13   13 years of age.  Again, Your Honor, he is telling us of how

14   dangerous of an individual he is.  Moreover, the doctor who

15   analyzed Mr. Carlin noted that his risk of sexual recidivism is

16   in the high -- the moderate to high range and we know this

17   based upon the fact that we know that Mr. Carlin has acted out

18   on his sexual urges.

19         And I'd also point to the facts of this particular

20   case, Your Honor.  The fact that Mr. Carlin did, in fact,

21   kidnap this child but not only kidnap this child, Mr. Carlin

22   did sexually abuse this child.  And I'd point to Paragraph 10

23   of the PSR and where Mr. Carlin describes exactly what

24   happened, what he made this child do, what he did to this

25   child, the photographs that he took of this child.  Now they

1    weren't nude photographs but they were photographs where this

2    child was asleep in a vehicle and he focused on certain parts

3    of her body.  But what is telling about Mr. Carlin's statement

4    in reference to what he did to this child is how he describes

5    the role he played.  He makes it sound like it was this child's

6    idea to pull the vehicle over and do what he -- do what he did

7    to this child, which is ludicrous.  His failure to accept

8    responsibility of what he did, I think, says a lot about

9    Mr. Carlin and what a dangerous individual he is.

10         Your Honor, I think the victim's mother said it best.

11   Mr. Carlin is a wolf in sheep's clothing.  He's a very

12   dangerous individual because if you were to look at him, he

13   looks like a young -- docile young man, but that's what he

14   does, Your Honor.  He gains people's trust.  He gained Jane

15   Doe's grandmother's trust.  She allowed him to stay with him

16   and the very first time he had access to Jane Doe, the very

17   first time she spent the night, he acted out on that.  And it

18   was every parent's worst nightmare at that point to waking up

19   in the middle of the night, knowing that your child is missing,

20   knowing that she is with Mr. Carlin in a stolen vehicle and

21   driving across the State of Texas to Arizona, not knowing

22   whether or not Mr. Carlin was going to hurt this child more so

23   than what he already did, not knowing whether or not you --

24   they would ever see their child again.  Mr. Carlin is a very

25   dangerous person and but for law enforcement, but for the FBI,

1  but for the state troopers who acted quickly, the volunteers --

2  we were able to get Jane Doe back.

3         But, Your Honor, we're going to ask for the high end

4  because the high end of this offense reflects the seriousness

5  of the offense.  It reflects how dangerous Mr. Carlin is.

6  Thank you, Your Honor.

7         **THE COURT:**  All right.  Mr. Byrne?

8         **MR. BYRNE:**  Judge, I'd like to make very brief

9  opening statements and Mr. Carlin's grandfather would like to

10 speak to the Court.

11        **THE COURT:**  Okay.

12        **MR. BYRNE:**  Briefly, Judge, you know, one of the

13 beautiful things about this country is that our judicial system

14 recognizes there are two sides.  And oftentimes in crimes where

15 there's a victim, it's a tragedy on both sides.  It's, of

16 course, a tragedy for the victim and it's also a tragedy for

17 the perpetrator.  So I'm going to make arguments arguing for a

18 20-year sentence but I don't mean to diminish in any way the

19 suffering of the victim and the victim's family in this case.

20 At this time, the defense would like to call Bob Carlin.  He'd

21 like to -- he is Mr. Carlin's grandfather.

22        **THE COURT:**  Okay.

23        **MR. BYRNE:**  He'd like to address the Court.  Should

24 he stand here or --

25        **THE COURT:**  That's fine.  He can stand.  Where do you

1 want him to stand, right there is okay?

2    **(No audible response)**

3       **MR. BOB CARLIN:** Hello, Your Honor.

4       **THE COURT:** Sir, would you raise your right hand?

5         **BOB CARLIN, DEFENDANT'S WITNESS, SWORN**

6       **MR. BOB CARLIN:** Good morning, Your Honor.

7       **THE COURT:** Good morning.

8       **MR. BOB CARLIN:** I'm Austin's grandfather. I love

9 him. I don't appreciate what he's done. I know what he has

10 done is not right but at a young age, Austin was sodomized. He

11 was sexually abused. We didn't find out about that until years

12 later. Okay. I'm not making excuses for him but Austin is 21

13 years old with a brain of a 10 year old. He acts as if though

14 he is 10 years old, not 21 years old. He's a 10 year old

15 trapped in a 21-year-old body. He -- according to the letter

16 that he sent me for my birthday, you can see where his level is

17 at. I understand he needs to be punished and I agree he needs

18 to be punished but to take away the rest of his life is

19 senseless to me because he is a good kid inside. He needs

20 medical help. I know he does. We've tried to get him medical

21 help. Financially, I can't afford thousands and thousands of

22 dollars.

23      If the Court could please take that into

24 consideration and try and get him the medical help that he

25 needs instead of just putting him behind bars and keeping him

1 there until he's an old man, it would be greatly appreciated.

2        **THE COURT:** All right. Thank you. Any questions

3 from the Government?

4        **MR. MARTINEZ:** No questions, Your Honor.

5        **THE COURT:** Thank you, sir. You can step down.

6 Anything further --

7        **MR. BYRNE:** Judge, I just -- just for the --

8        **THE COURT:** -- from the defense?

9        **MR. BYRNE:** Yes, Your Honor, just for the sake of the

10 hearing, I did file a sentencing memorandum. I don't have a

11 whole lot to add outside of that. Just -- I'd just like to

12 summarize it briefly. We're asking for, obviously, a sentence

13 that's lower than guidelines. We're asking the Court to depart

14 or to vary to the mandatory minimum and there are several

15 reasons. First is 5K2.13 which is a chapter in the Federal

16 Sentencing Guidelines that suggests that a downward departure

17 might be warranted in a case where a defendant suffers from a

18 diminished capacity. I think that -- you know, I'm not certain

19 that his case falls squarely under that chapter, to be frank

20 but, I think that it's something that the Court should consider

21 as a policy under the Guidelines. The Guidelines suggest a

22 downward departure when an individual, while suffering from a

23 significantly reduced mental capacity and that mental capacity

24 contributed substantially to the commission of the offense.

25 And I think it's clear from the evaluations that have been

1  done, the facts and circumstances of the case that Mr. Carlin

2  does have a significant reduced mental capacity.

3         He -- you know, something that's very interested,

4  Judge, is that he -- when he -- the same day that he was

5  arrested, he was interrogated by FBI agents and he said in that

6  inter -- in that interrogation he knew what he had done was

7  wrong.  He admitted to sexually assaulting the victim in this

8  case pretty much without prompting from the FBI.  He

9  volunteered that information and we can look at that as, well,

10  he -- that was an unwise confession or he's very

11  unsophisticated or he's naïve.  Well, the other way of looking

12  at is, is, well, maybe that was extraordinary acceptance of

13  responsibility.

14         His criminal history, I think is interesting because

15  it reflects a lot of what happened in this case and it shows a

16  lack of forethought and planning, spur of the moment, getting

17  into a -- taking someone else's vehicle and just taking off

18  which is what he did in this case.  And I think that that lends

19  itself -- and including his mental illness and his diagnoses

20  and the symptoms of those diagnoses contribute to Mr. Carlin

21  maybe not having complete control or power over reason or to

22  control behavior he knows is wrongful.  And, you know, there's

23  two ways of looking at that.  You know, I'm sure the Government

24  would argue that his lack of control and diminished, I guess,

25  capacity for reason makes him more dangerous and in some ways,

1    it does.  But we -- and that's what this Guideline suggests, is

2    that we take into account the fact that Mr. Carlin, he's not

3    functioning like a -- as an adult, a healthy adult who is --

4    has a full capacity to understand right and wrong and to make

5    decision, and that's mitigating.

6          We, as a people, acknowledge that someone like

7    Mr. Carlin has a reduced, I think, culpability when it comes to

8    crimes like this because in some ways, it's less sinister.

9    He's not this grown man who's making choices with a healthy

10   brain.  And so I ask the Court to consider his diminished

11   capacity in forming a sentence.

12         His criminal history also contributes to his

13   Guideline range.  He has six criminal history points.  I think

14   that that's over-represented.  All of his criminal history took

15   place in about the course of a year when he was the age 17 and

16   18.  His criminal history is also, I would argue, relatively

17   benign and I think that what we see in his criminal history is

18   part of what we see in this case which is criminal behavior

19   fueled by his mental limitations.

20         And then the other thing I wanted the Court to

21   consider is the quality of Mr. Carlin's incarceration.  How --

22   you know, I think that we need to question what's going to

23   happen to him in prison.  Is he himself going to be abused,

24   taken advantage of in prison?  Is he going to be able to take

25   advantage of the educational opportunities because he has such

1    a low learning capacity?

2          And then when Mr. Carlin's released from custody, be

3    it 20 years or 50 years from now, he's going to be released;

4    and what is our responsibility to deter future criminal

5    behavior, to rehabilitate Mr. Carlin which is a stated goal of

6    the sentence?  He's going to miss his 20s and 30s which is the

7    years that even normal healthy people use to learn skills to

8    survive in life independently.  And Mr. Carlin, who -- he --

9    who just naturally has a hard time doing that, how is he going

10   to be when he's released when he's 40 or 50 or 60?  Does

11   prolong -- is prolonged incarceration going to make it so that

12   Mr. Carlin can survive on his own if he's released?  If -- even

13   if he gets -- if the Court sentences him at the low -- at the

14   minimum, he's still going to be about 40 years old when he's

15   released.

16         I did include a copy of the letter that Mr. Carlin

17   wrote to his grandfather.  Now it -- that letter, I think,

18   expresses my dealings with Mr. Carlin, is that he is -- he's

19   childish and he's not childish in a sense that he's immature or

20   he hasn't had life experiences.  He's childish because that's

21   the way his brain is; and when I speak to Mr. Carlin, I often

22   feel like I'm dealing with one of my children who are 8 and 12

23   in the way that I have to explain things to him and his

24   reactions to things.

25         So we'd like to ask the Court also to recommend --

1   well, here's the other thing, too, is that he -- his legal

2   problems may not be over after the sentence.  He -- you know, I

3   -- it's my understanding that the -- his -- Ms. Langford had

4   discussed with the State District Attorney's Office about not

5   filing charges of indecency with a child against Mr. Carlin but

6   that's not a guarantee.  I don't know what they're going to do.

7   I assume that they're not but it's possible that they'll decide

8   that 20 years wasn't enough.  Maybe they'll listen to the

9   victim's family in that a greater sentence is required and

10  they'll charge him with indecency with a child and he'll go

11  back to the State which by the way, I believe he was in State

12  custody first so if he goes back to State custody to face

13  indecency with a child charge and gets a sentence there, he's

14  going to go to State custody first and then he'll go to the --

15  to federal custody.

16          He also has revocation proceedings pending in

17  Colorado so I'm asking the Court to include in the judgment

18  your recommendation that this federal sentence run concurrent

19  with a sentence that he receives in the State of Texas or in

20  the State of Colorado for his pending charges.  And I think

21  that his -- and the quality of his incarceration could be

22  greatly improved if he was close to his family while he was

23  incarcerated so we're asking the Court also to recommend to the

24  Bureau of Prisons that he serve his sentence in a prison as

25  close as Colorado Springs, Colorado.

1          **MR. MARTINEZ:**  May I address the Court, Your Honor?

2          **THE COURT:**  Yes.

3          **MR. MARTINEZ:**  Your Honor, just so that the Court

4    knows, I did personally speak to the First Assistant of the

5    Nueces County DA's Office prior to Mr. Carlin pleading guilty

6    to this offense and it was explained to me by the First

7    Assistant that the District Attorney's Office would not pursue

8    the state charges against Mr. Carlin.  This is something that I

9    discussed with the victim's family prior to this plea

10   agreement, so just so the Court can understand that what

11   Mr. Carlin receives today in federal court will be his

12   punishment.

13          Furthermore, if allowed to do so, may I address the

14   5K2.13 diminished capacity argument from the defense?

15          **THE COURT:**  Yes.

16          **MR. MARTINEZ:**  If I can do so, Your Honor, the

17   diminished capacity policy statement specifically states that

18   if the departure is warranted under the policy, the extent of

19   the departure should reflect the extent to which the reduced

20   mental capacity contributed to the commission of the offense.

21   We are not here because Mr. Carlin has the mind of a 10 year

22   old.  That did not contribute to his offense.  We are here

23   because Mr. Carlin is a sexual predator.  I believe that those

24   are two different things.  This is more of a scenario where

25   someone with a low, diminished capacity was may be talked into

1  running aliens or drugs through the checkpoint.  This is a

2  totally separate situation.  That being said, more importantly,

3  Your Honor, the guidelines specifically state a court may not

4  depart below the applicable guideline range if -- and I'll

5  point to number two -- facts and circumstances of the

6  defendant's offense indicated a need to protect the public

7  because the offense involved actual violence or a serious

8  threat of violence.  Well, that's exactly what we have here.

9  We need a sentence that will protect the public form

10  Mr. Carlin.

11         But moreover, number three states that the

12  defendant's criminal history indicates a need to incarcerate

13  the defendant to protect the public.  Again, that's the exact

14  same argument that I have.

15         Lastly, number four, if the defendant had been

16  convicted of an offense under Chapter 71 or 109 or 110 or 117,

17  he would not be eligible for this offense.  Well, he wasn't

18  convicted under those chapters but Chapter 109(a) is sexual

19  abuse.  He was convicted of a kidnapping but his crime involved

20  just that, the sexual abuse of a child and I think that

21  Congress is telling us that when we're dealing with offenses

22  involving children, we're not going to care about mental

23  capacity because it wasn't the fact that the person had mental

24  capacity that caused him to sexually abuse a child.  It's the

25  fact that the person was a sexual deviant.  So we would -- we

1  argue that the departure for mental capacity is inappropriate

2  in this particular case, Your Honor.

3          **THE COURT:**  Anything else before I allow your client

4  to speak, Mr. Byrne?

5          **MR. BYRNE:**  No, Your Honor.  Mr. Carlin would like

6  to --

7          **THE COURT:**  Mr. Carlin, is there anything you want to

8  say to the Court about your sentence?

9          **THE DEFENDANT:**  I just really want to say I'm sorry

10  and -- to the family and to my grandfather and my family, and I

11  want to get as much education as I can while I'm in prison.

12          **THE COURT:**  Okay.  Is that all?

13      **(Pause)**

14          **MR. MARTINEZ:**  Your Honor, may I address the Court?

15  I have spoken to the victim's family.  They indicated at length

16  -- so has Probation in reference to restitution -- they have

17  indicated they don't have a restitution request but I would

18  like to ask them one more time before the Judge issues

19  sentencing?

20          **THE COURT:**  Okay.

21      **MR. MARTINEZ:**  Thank you, Your Honor.

22      **(Pause)**

23          **MR. MARTINEZ:**  Nothing further, Your Honor.  We're

24  ready to proceed.

25      **(Pause)**

1      **THE COURT:**  The Court adopts the presentence report

2  as written.  The Court's going to deny a request for a

3  variance, will sentence the defendant at the low end of the

4  guideline which is 262 months based on the mental health and

5  intellectual disability set forth here in the report and as has

6  been argued and presented to the Court in the past.  So Court

7  will sentence the defendant to 262 months in custody, order you

8  to pay to the United States a special assessment of $100.00.

9      On release from custody, you will be placed on

10  supervised release for a term of 10 years.  While on that

11  supervision, you'll be ordered to comply with standard

12  conditions that have been adopted by the Court, abide by any

13  mandatory conditions required by law and some of the mandatory

14  conditions include that you not possess a firearm, ammunition,

15  destructive device, or any other dangerous weapon, that you

16  cooperate in the collection of DNA as directed by the probation

17  officer, that you comply with the requirements of the Sex

18  Offender Registration and Notification Act as directed by a

19  probation officer, the Bureau of Prisons, or any state

20  registration where you reside or where you work or where you're

21  a student.

22      Based on the information in the report, I'm going to

23  order special conditions that you participate in a mental

24  health program as being necessary and approved by the probation

25  officer.  There are several conditions that are specific to the

1   type of offense here and I do need to review those with you.

2   So if you don't understand or if I'm going too fast, please let

3   me know.

4           First is the sex offender children prohibition and it

5   requires that you not reside, work, access, or loiter within

6   1,000 feet of schoolyards, parks, playgrounds, arcades, or

7   other places that are used primarily by children under the age

8   of 18, where children generally congregate, where you generally

9   find children unless approved in advance in writing by the

10  probation officer.

11          The next part of that is that you not have contact

12  with any minor child without being supervised by an adult

13  family member unless authorized by the probation officer and

14  that includes any activity such as athletic, religious,

15  volunteer, civic activities that are designed for minors under

16  the age of 18.

17          The next one is that you not date or cohabitate with

18  anyone who has children under the age of 18 unless approved in

19  advance in writing by the probation officer.

20          The next one requires you to participate in sex

21  offender counseling, so you'll be required to participate in a

22  sex offender treatment program as approved by the probation

23  officer.  That could include group therapy sessions, individual

24  therapy sessions.  It can include polygraph testing and you

25  will incur the cost of that treatment but that is based on your

1    ability to pay as determined by the probation officer.  When

2    you receive that treatment, the Court's going to order that you

3    waive your right to any confidentiality in those records, those

4    treatment records so that the probation officer can review your

5    course of treatment, and this Court's also going to authorize

6    the release of information in the presentence report that can

7    help or assist with that treatment, the sex offender treatment.

8            And I briefly mentioned this earlier but you will be

9    required to register with the sex offender registration agency

10   in any state where you live, where you're employed, where

11   you're a student, as directed by the probation officer.

12           Anything else on the conditions from Probation?

13           **PROBATION OFFICER GARCIA:**  No, Your Honor, just the

14   general mental health special condition which --

15           **THE COURT:**  Yes, and I did -- I believe that was the

16   first one I stated, the mental health --

17           **PROBATION OFFICER GARCIA:**  Okay.

18           **THE COURT:**  -- treatment.  I believe I covered that.

19   So the Court will not impose a fine.  There's no restitution to

20   address before the Court so the Court --

21           **MR. MARTINEZ:**  That's correct, Your Honor.

22           **THE COURT:**  -- will not impose any restitution.  The

23   Court has considered the advisory guideline sentencing factors

24   set forth in 3553.  The Court finds the sentence imposed is

25   sufficient but not greater than necessary to impose an

1    appropriate sentence.  The Court finds the sentence promotes

2    respect for the law and provides just punishment.

3                There was only one count in the indictment?

4                **MR. MARTINEZ:**  That's correct, Your Honor.

5                **THE COURT:**  And he entered a plea to that.

6    Mr. Carlin, you do have the right to appeal your conviction and

7    sentence here.  If you want to do that, you must file a notice

8    with the Court, a notice of appeal within 14 days; and if you

9    can't afford an attorney or the cost of an appeal, you can ask

10   the Court to appoint you an attorney.  Do you understand your

11   right to appeal your conviction and sentence?

12               **THE DEFENDANT:**  Yes.

13               **THE COURT:**  Have you understood everything we've done

14   today?

15               **THE DEFENDANT:**  Yes, Your Honor.

16               **THE COURT:**  Do you have any questions about anything?

17               **THE DEFENDANT:**  No.

18               **THE COURT:**  Okay.  Mr. Byrne?

19               **MR. BYRNE:**  I'd just like to ask the Court to

20   consider our --

21               **THE COURT:**  Recommendation, yeah.  Court will make a

22   recommendation that he be placed in a facility near Colorado

23   Springs, Colorado.  Anything else?

24               **MR. BYRNE:**  Your Honor --

25               **PROBATION OFFICER GARCIA:**  Your --

1       **MR. BYRNE:**  -- we also suggested a concurrent

2  sentence.  The Court can --

3       **THE COURT:**  So there is nothing convened in state

4  court, doesn't sound like there's going to be and in terms of

5  the revocation -- so he was in Texas state custody, nothing's

6  pending there, so federal custody will be sent maybe to

7  Colorado to address what's convened there?

8       **MR. BYRNE:**  Possibly.  I don't know.

9       **THE COURT:**  Oh, yeah.

10      **PROBATION OFFICER GARCIA:**  I think what's happing in

11  Colorado is separate.  I'm not sure they're interested in

12  extradition at all but he is on a writ so he's in state custody

13  right now.  But when those charges are dropped, he'll roll over

14  to the federal system and --

15      **THE COURT:**  Okay.

16      **PROBATION OFFICER GARCIA:**  -- likely they'll give him

17  all the time that he was incarceration (sic) towards this

18  sentence.

19      **THE COURT:**  But he -- okay, for Colorado?

20      **PROBATION OFFICER GARCIA:**  No.  For Colorado, I don't

21  think is --

22      **THE COURT:**  But Texas doesn't sound like it's doing

23  anything.

24      **PROBATION OFFICER GARCIA:**  Right.  He still is on a

25  writ of habeas as far as I'm concerned or as far as I know.

1          **THE COURT:**  So they may dismiss if there's anything

2     pending?  Is there something pending or it was just going to

3     wait to see what happened here or what?

4          **MR. MARTINEZ:**  That's correct.  They were going to

5     wait to see what happened in -- well, they were going to --

6     they're going to dismiss their case after we're done here

7     today.

8          **THE COURT:**  Okay.

9          **MR. BYRNE:**  Judge, just so the Court knows, the --

10    the First Assistant that Mr. Martinez --

11         **THE COURT:**  Is gone.

12         **MR. BYRNE:**  -- he's gone so I don't know what their

13    stance is at this point.  I -- you know, we can assume that --

14    and it sounds like that's what usually happens is the -- his

15    state case will be dismissed but I don't know that.  I don't --

16         **PROBATION OFFICER GARCIA:**  I had this conversation,

17    Your Honor, with the State Prosecutor's Office as well and they

18    basically told me they were going to dis -- they were waiting

19    for this hearing.

20         **THE COURT:**  Okay.  So what Mr. Byrne has requested

21    then probably, right, is that the Colorado -- anything that

22    happens in Colorado run concurrent.

23         **MR. BYRNE:**  And also if there is a state charge and

24    he gets a sentence on that one, I'd like -- we'd like to ask

25    the Court to make that recommendation also.

1          **THE COURT:**  Anything from the Government on that?

2          **MR. MARTINEZ:**  No, Your Honor.  I would say let the

3    state government do whatever they're going to do.

4          **THE COURT:**  Yeah.

5          **MR. BYRNE:**  Well, I think that they will do whatever

6    they want to do.  I think what that does is it -- if he does go

7    to state custody, he's sentenced and he serves his sentence

8    with the state and then he goes into federal custody, it'll

9    broaden the BOP's, I guess, discretion or it would encourage

10   the Bureau of Prisons --

11         **THE COURT:**  Right.

12         **MR. BYRNE:**  -- to give him credit for the time he

13   spent in state custody.

14         **THE COURT:**  But I think where the issue is that he

15   was taken in state -- Texas state custody -- I'm fairly

16   comfortable that those charges are not going to proceed so he

17   is now in federal custody so Colorado, anything they do is

18   going to be after he's been sentenced here, right, so he would

19   be doing his fed time first.  So I will allow that court to

20   decide if they want to run their sentence, if any, concurrent

21   with this sentence because I don't think we're going to have

22   the issue where while he's in state, he was -- he's here on a

23   writ because I'm confident from what's been presented to the

24   Court that the Texas -- anything that may have been pending

25   will be dismissed so then he's going to be a federal prisoner

1    if he goes to Colorado.  So anything else?

2              **MR. MARTINEZ:**  Nothing from the Government, Your

3    Honor.

4              **MR. BYRNE:**  In the event that there's an appeal, the

5    sentence is procedurally and substantively unreasonable,

6    particularly with the sex offender conditions of supervised

7    release.  Thank you, Your Honor.

8              **THE COURT:**  Okay.  If nothing further then, he can be

9    remanded.  Was there something else?

10             **PROBATION OFFICER GARCIA:**  Yeah.  Just one thing,

11   Your Honor, just for clarity on the judgment with the

12   restitution, I understand there's not going to be one imposed

13   but the reason for the judgment I'll have to check off, would

14   it be just --

15             **THE COURT:**  Reason there -- there's not restitution?

16             **PROBATION OFFICER GARCIA:**  Yes.

17             **THE COURT:**  Because there was nothing presented --

18             **PROBATION OFFICER GARCIA:**  Nothing presented --

19             **THE COURT:**  -- to the Court at all.  There's no

20   evidence before the Court to impose any restitution at all.

21   So --

22             **PROBATION OFFICER GARCIA:**  Thanks, Judge.

23             **THE COURT:**  Okay.

24        **(Hearing adjourned at 11:09 a.m.)**

25

<u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          <u>November 2, 2016</u>

        Signed                              Dated

*TONI HUDSON, TRANSCRIBER*